Brian A. Knutsen, OSB # 112266
KAMPMEIER & KNUTSEN PLLC
833 S.E. Main Street, No. 318
Portland, Oregon 97214
Telephone:  (503) 841-6515
Email:  brian@kampmeierknutsen.com

Paul A. Kampmeier, WSBA #31560
   **Applicant for admission *pro hac vice***
KAMPMEIER & KNUTSEN PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
Telephone:  (206) 223-4088 x 4
Email:  paul@kampmeierknutsen.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, | ) ) ) | Civil Case No.: _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | COMPLAINT |
| BJB MILLING & LUMBER, LLC, | ) ) | [ENVIRONMENTAL MATTER] |
| Defendant. | ) ) ) | |
| _____ | ) | |

COMPLAINT

## I.    INTRODUCTION

1.    This action is a citizen suit brought under Section 505 of the Clean Water Act ("CWA" or "Act") as amended, 33 U.S.C. § 1365.  Plaintiff Northwest Environmental Defense Center ("NEDC") seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendant BJB Milling and Lumber, LLC's ("Defendant") repeated and ongoing violations of the terms and conditions of its National Pollutant Discharge Elimination System ("NPDES") permit, which authorizes discharges of pollutants and stormwater associated with industrial activity from Defendant's facility to waters of the United States.

## II.    JURISDICTION AND VENUE

2.    The Court has subject-matter jurisdiction under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).  That section of the CWA authorizes lawsuits against any person who is alleged to be in violation of an "effluent standard or limitation."  Id.  The Act defines the term "effluent standard or limitation" to include "a permit or condition thereof issued under section 1342 of this title...."  33 U.S.C. § 1365(f)(6).  Jurisdiction is proper in this Court because NEDC alleges that Defendant is in violation of the terms and conditions of its NPDES permit, which was issued under Section 402 of the Act, 33 U.S.C. § 1342.  The relief requested herein is authorized by 33 U.S.C. §§ 1319(d) and 1365.

3.    In accordance with Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), by letter dated September 24, 2015, NEDC notified Defendant of Defendant's violations of its NPDES permit and the CWA and of NEDC's intent to sue for those violations ("Notice Letter").  Defendant received the Notice Letter on October 9, 215.  In accordance with 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. § 135.2(a)(1), NEDC sent copies of the Notice Letter to

COMPLAINT

Defendant's registered agent, the Administrator of the U.S. Environmental Protection Agency

("EPA"), the Administrator of EPA Region 10, and the Director of the Oregon Department of

Environmental Quality ("ODEQ") by mailing copies of the Notice Letter to those individuals via

certified mail, postage pre-paid and return receipt requested, on September 24, 2015.  A copy of

the Notice Letter is attached to this Complaint as <u>Exhibit 1</u> and the allegations in the Notice

Letter are hereby incorporated by reference.

 4. At the time of the filing of this Complaint, more than sixty days had passed since

the Notice Letter and copies thereof were mailed as described in the preceding paragraph.

 5. The Clean Water Act violations complained of in the Notice Letter are continuing

or are reasonably likely to recur.  Defendant is in violation of its NPDES permit and the CWA.

 6. At the time of the filing of this Complaint, neither the EPA nor ODEQ had

commenced any action constituting diligent prosecution to redress the violations alleged in the

Notice Letter.

 7. The source of the violations complained of in the Notice Letter is located in Lane

County, Oregon, and venue is therefore appropriate in the District of Oregon under Section

505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1).

### III. PARTIES

 8. Plaintiff Northwest Environmental Defense Center is a membership organization

suing on behalf of itself and its members.  NEDC is an independent non-profit corporation

organized and existing under the laws of the State of Oregon.  NEDC maintains its principal

place of business in Multnomah County, Oregon.  Since 1969, the staff, student volunteers, and

members of NEDC have advocated for cleaner water and air and for the preservation of public

lands and wildlife habitat across the Pacific Northwest.  NEDC and its members are "citizens" as defined by Section 505(g) of the Act, 33 U.S.C. §1365(g).

9.      The mission of NEDC is to protect and conserve the environment and natural resources of the Pacific Northwest.  NEDC and its members have a particular interest in, and derive aesthetic, recreational, and other benefits from, Oregon's rivers, streams, lakes, and bays, including Amazon Creek, the Amazon Diversion Canal, the Long Tom River, and the Willamette River, as well as the aquatic species that use and rely on those waters.  NEDC and its members work to conserve and protect Oregon's water resources and aquatic species.  NEDC's members use waters and adjacent lands downstream from Defendant's discharges for recreational and other activities, including boating, fishing, nature watching, hiking, and aesthetic enjoyment. NEDC's members use and enjoy Amazon Creek, the Amazon Diversion Canal, the Long Tom River and/or the Willamette Rivers, as well as waters downstream of those streams, for fishing, recreation and other activities.  Additionally, many members of NEDC live or work near Oregon waters or otherwise have an interest in Oregon waters.  NEDC and its members intend to continue all of these activities in the future.

10.      NEDC has representational standing to bring this lawsuit.  Defendant has consistently violated the conditions of its NPDES permit and exceeded the permit's benchmark pollutant discharge levels.  NEDC has at least one member who is injured by Defendant's discharges of polluted stormwater and failure to comply with its NPDES permit.  Recreational, economic, aesthetic, conservation, health, and/or other interests of NEDC and its members have been, are being, and will be adversely affected by Defendant's unauthorized discharges of pollutants and/or industrial stormwater to Amazon Creek, the Amazon Diversion Canal, and the Long Tom and Willamette river systems.  NEDC's and its members' interests in Amazon Creek,

the Amazon Diversion Canal, the Long Tom and Willamette river systems, and the waters to which those streams contribute, are diminished by their polluted state, by Defendant's illegal discharges of pollutants and industrial stormwater, and by Defendant's other NPDES permit violations. These injuries are fairly traceable to the conduct challenged herein. The relief sought in this lawsuit can redress the injuries to these interests.

11.    NEDC has organizational standing to bring this action. NEDC has been actively engaged in a variety of educational and advocacy efforts to improve water quality and to address sources of water quality degradation in Oregon. NEDC's organizational interests have been adversely affected by Defendant's NPDES permit violations. Defendant has failed to fulfill the monitoring, recordkeeping, reporting, planning, and other obligations necessary for compliance with its NPDES permit and the CWA. As a result, NEDC is deprived of information that would further its efforts to serve its members by disseminating information and taking appropriate action. NEDC's efforts to educate and advocate for greater environmental protection for the benefit of its members are thereby obstructed. These injuries are fairly traceable to Defendant's violations and are redressable by this Court.

12.    Defendant BJB Milling and Lumber, LLC is a Domestic Limited Liability Company organized and existing under the laws of the State of Oregon. Defendant owns and operates a secondary wood processing facility located at or about 101 Iowa Street, Eugene, Oregon 97402 (hereinafter "facility").

**IV.    LEGAL BACKGROUND**

**A.    <u>The CWA's Prohibition on Adding Pollutants from Point Sources to Waters of the U.S.</u>**

13.    Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

COMPLAINT

14.     As relevant here, Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits "the discharge of any pollutant by any person" unless such discharge is authorized by an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. §1342.

15.     The Act defines the term "discharge of a pollutant" to mean, in part, "any addition of any pollutant to navigable waters from any point source…."  33 U.S.C. § 1362(12).

16.     The Act defines the term "point source" to mean, in part, "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

17.     The Act defines the term "pollutant" to mean, in part, "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).

18.     Although neither the Act nor its implementing regulations define the term "addition," one court found that "addition" means the introduction of a pollutant into navigable waters from any place outside the particular water body.  *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 491 (2nd Cir. 2001).

19.     The Act's prohibition on discharging pollutants from point sources applies broadly.  The Act defines the term "navigable waters" to mean "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  And the Act defines the term "person" to mean "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."  33 U.S.C. § 1362(5).

COMPLAINT

B.    **EPA and Some States Authorize Discharges of Pollutants by Issuing NPDES Permits.**

20.    Section 402(a) of the Act authorizes EPA to issue NPDES permits authorizing discharges of pollutants and stormwater associated with industrial activity.  33 U.S.C. §1342(a), (p).  EPA may delegate administration of the NPDES permit program to states with regulatory programs meeting applicable criteria.  33 U.S.C. § 1342(b); 40 C.F.R. Part 123.

21.    Federal and state regulations require any person who discharges or proposes to discharge pollutants or stormwater associated with industrial activity to waters of the United States to apply for an NPDES permit.  40 C.F.R. § 122.21(a); OAR 340-045-0015(2) & (5).

22.    Compliance with the terms and conditions of an NPDES permit is deemed compliance with the general discharge prohibition in Section 301(a).  33 U.S.C. § 1342(k).  Any permit noncompliance is grounds for a citizen enforcement action.  33 U.S.C. §§ 1365(a)(1), (f)(6).

## V.  FACTS

A.    **Oregon's General NPDES Stormwater Discharge Permit Number 1200-Z and Defendant's NPDES Permit Coverage.**

23.    The State of Oregon implements a federally-approved NPDES permit program administered by the ODEQ.  See OAR Chapter 340-045.  ODEQ issues general and individual NPDES permits authorizing discharges of pollutants in the State of Oregon.  A person seeking coverage under one of ODEQ's general permits must submit certain application materials to ODEQ, which then assigns NPDES permit coverage to the discharger if appropriate.

24.    ODEQ periodically issues a general NPDES permit authorizing discharges of stormwater associated with industrial activity in Oregon.  For facilities that obtain coverage under it, so-called "permittees," ODEQ's current General Stormwater Discharge Permit Number

1200-Z authorizes discharges of industrial stormwater from July 1, 2012 to June 30, 2017 ("2012 General Permit"), provided the discharges are in compliance with the terms and conditions of the permit. Once a facility obtains NPDES permit coverage under the 2012 General Permit, a violation of the permit or any condition thereof is subject to citizen suit enforcement. 33 U.S.C. §§ 1365(a)(1), (f)(6).

25.    To reduce and eliminate pollutant concentrations in stormwater discharges, the 2012 General Permit requires permittees to develop and implement a Stormwater Pollution Control Plan ("SWPCP"); to monitor and report pollutant loadings in stormwater discharged from the facility; and, in certain circumstances, to revise the SWPCP and implement more comprehensive stormwater management practices over time to protect water quality.

26.    Defendant's facility discharges stormwater associated with industrial activity and other pollutants via point-source stormwater conveyances to Amazon Creek and/or the Amazon Diversion Canal, the Long Tom River, and the Willamette River.

27.    By letter dated September 12, 2013, ODEQ granted Defendant NPDES permit coverage under the 2012 General Permit, thereby authorizing those stormwater discharges from Defendant's facility that are in compliance with the terms and conditions of Defendant's NPDES permit. ODEQ assigned Defendant file number 108749. Under the same permit number, Defendant also had coverage under the previous iteration of ODEQ's General Stormwater Discharge Permit (the "2007 General Permit") for industrial stormwater discharges from Defendant's facility.

28.    BJB Milling's NPDES permit prohibits any direct or indirect discharge to waters of the state that is not in compliance with the terms and conditions of the permit. BJB Milling's

NPDES permit also clearly states: "Any permit noncompliance constitutes a violation of … the Clean Water Act … and is grounds for enforcement action…."

**B.**    **Defendant's Violations of its NPDES Permit.**

29.    Defendant is discharging pollutants and stormwater associated with industrial activity from the BJB Milling & Lumber, LLC facility at or near 101 Iowa Street, Eugene, Oregon 97402 to Amazon Creek and/or the Amazon Diversion Canal, the Long Tom River, and the Willamette River, in violation of the terms and conditions of its NPDES permit. Defendant's violations of its NPDES permit and the CWA are set forth in section I of the Notice Letter and are hereby incorporated by reference.

**1.    Defendant Violated Its Permit by Failing to Comply with The Effluent Limits and Required Stormwater Control Measures in its NPDES permit.**

30.    Defendant violated the narrative, technology based effluent limits and the permit conditions setting forth the control measures required to meet those limits. Schedule A.1 of Defendant's NPDES permit requires Defendant to implement the listed narrative, technology-based effluent limits—to implement a variety of best management practices listed in the permit to reduce pollutants in stormwater discharged from its facility—as well as the sector-specific effluent limits listed in Schedule E of Defendant's NPDES permit, which require Defendant to limit the discharge of wood debris, minimize leachate from decaying wood materials, and minimize the generation of dust.

31.    Additionally, Schedule A.3.a of Defendant's NPDES permit requires Defendant "to select, design, install, implement and maintain control measures to meet the narrative and numeric technology based effluent limits in Schedule A.1, A.2 and Schedule E of the permit and [to] describe[] these measures in the SWPCP." Schedule A.6.c of the NPDES permit requires Defendant to implement the SWPCP. And Schedule A.3.b of the NPDES permit requires

Defendant to "…reduce or eliminate pollutants to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice."

32.    Defendant has violated and is violating Schedule A.1, Schedule E, Schedule A.3.a, Schedule A.3.b, and Schedule A.6.c of its NPDES permit by failing to implement the narrative, technology-based effluent limits in Schedule A.1 and Schedule E of its NPDES permit; by failing to select, design, install, implement, and maintain control measures that meet the narrative, technology-based effluent limits in Schedule A.1 and Schedule E of its NPDES permit; by failing to describe such measures in its SWPCP; and by failing to fully implement its SWPCP.  These violations are demonstrated in part by the fact that Defendant is greatly exceeding the pollutant benchmarks imposed by Schedule A.9 of Defendant's NPDES permit.

33.    Schedule A.9 of the NPDES permit explains that the benchmarks "are designed to assist the permit registrant in determining whether its site controls are effectively reducing pollutant concentrations in stormwater discharged from the site."  Schedule A.9 establishes the following statewide benchmarks applicable to Defendant: total copper, 0.020 mg/L; total lead, 0.040 mg/L; total zinc, 0.12 mg/L; pH, 5.5 – 9.0 S.U.; total suspended solids, 100 mg/L; and total oil and grease, 10 mg/L.  Additionally, Schedule E.A.3 of Defendant's NPDES permit establishes sector-specific benchmark of 120.0 mg/L for chemical oxygen demand.  Because Defendant discharges to a water body that is not meeting water quality standards for various pollutants, including arsenic, Defendant's NPDES permit also requires Defendant to monitor for arsenic and establishes a reference concentration for arsenic of 0.0021 mg/L.

34.    As indicated in Table 1, below, Defendant has repeatedly failed to meet the benchmarks established by its NPDES permit, demonstrating that Defendant's stormwater

controls are not effectively minimizing or reducing pollutants in stormwater discharged from the facility and that Defendant is in violation of Schedule A.1, Schedule E, Schedule A.3.a, Schedule A.3.b and Schedule A.6.c of its NPDES permit.  Defendant can and must do more to reduce those pollutant loads, including revising its SWPCP and then implementing those revisions in a timely manner.  These permit requirements and Defendant's violations thereof are described in section I.B. of the Notice Letter and are hereby incorporated by reference.  These violations have occurred each and every day since Defendant obtained its NPDES permit coverage on September 12, 2013, and are ongoing.

| | pH (S.U.) (Bench-mark: 5.5 - 9.0 S.U.) | TSS (mg/L) (Bench-mark: 100 mg/L) | O & G (mg/L) (Bench-mark 10 mg/L) | Copper (mg/L) (Bench-mark: 0.020 mg/L) | Lead (mg/L) (Bench-mark: 0.040 mg/L) | Zinc (mg/L) (Bench-mark: 0.12 mg/L) | COD (mg/L) (Bench-mark 120 mg/L) | Arsenic (mg/L) (Bench-mark: 0.0021 mg/L) |
|---|---|---|---|---|---|---|---|---|
| 11/12/13 | 6.9 | **1420** | ND | **0.37** | **0.12** | **0.74** | 399 | **0.017** |
| 12/13/13 | 8 | **1110** | ND | **0.23** | **0.058** | **1.1** | **370** | |
| 2/18/14 | 6.8 | **1220** | **29.5** | **0.18** | **0.049** | **0.84** | **333** | **0.007** |
| 3/27/14 | 6.55 | **7660** | **49.3** | **0.31** | **0.36** | **4.5** | **1580** | |
| Geo-Mean | | **2001.8** | 9.76 | **0.2625** | **0.105** | **1.3244** | **527.92** | |
| 11/3/14 | 7.14 | **1860** | **30.1** | **0.444** | **0.152** | **2.38** | **612** | **0.0189** |
| 11/21/14 | 7.29 | **3900** | **56.2** | **0.661** | **0.223** | **3.59** | **961** | |
| 2/2/15 | 7.1 | **2400** | **55** | **0.458** | **0.284** | **2.83** | **1100** | **0.0079** |
| 3/23/15 | W | **2000** | **32** | **0.46** | **0.19** | **2.4** | **150** | |
| Geo-Mean | | **2429** | **42** | **0.499** | **0.207** | **2.76** | **558** | |

**Table 1**
**Discharge Monitoring Results Reported by BJB Milling**

TSS – total suspended solids
O & G – oil and grease
COD – chemical oxygen demand
ND – No Detect, result below analysis detection level
W – Waiver, monitoring requires for the parameters are waived
**Bold** – result is over the permit benchmark

COMPLAINT

35.      Schedules B.2 and B.8 of Defendant's NPDES permit require that Defendant collect and have analyzed samples of discharges that are representative of stormwater discharges from the facility and report the results of such analyses to ODEQ or the City of Eugene on Discharge Monitoring Reports ("DMRs") approved by ODEQ.  Table 1 above provides monitoring results reported to ODEQ or the City of Eugene by Defendant on DMRs under the NPDES permit conditions.

36.      Defendant violated the water quality-based effluent limitations in its NPDES permit.  Schedule A.4.a of Defendant's NPDES permit prohibits Defendant from causing or contributing to a violation of instream water quality standards as established in Oregon Administrative Rules 340-041.  Defendant has violated and is violating Schedule A.4.a of its NPDES permit by discharging stormwater that causes or contributes to violations of the water quality standard for arsenic in one or more of the receiving waters.  These permit requirements and Defendant's violations thereof are described in section I.C. of the Notice Letter and are hereby incorporated by reference.  These violations have occurred each and every day since Defendant obtained its coverage under the 2012 General Permit and on which there was 0.1 inch or more of precipitation, including on November 12, 2013, February 18, 2014, November 3, 2014, and February 2, 2015, when Defendant collected a sample of its stormwater discharge that exceeded the reference concentration for arsenic.  These violations are ongoing.

**2.      Defendant Violated Its NPDES Permit by Failing to Prepare and Implement the Required Stormwater Pollution Control Plan.**

37.      Defendant violated its NPDES permit by failing to prepare and implement a SWPCP consistent with the requirements of the NPDES permit.  Defendant exceeded the benchmark for total suspended solids ("TSS") for its fourth year geometric mean evaluation under Defendant's prior NPDES permit.  Condition 4.a.ii.1 of Defendant's NPDES permit

therefore required Defendant to submit to the City of Eugene, by March 31, 2012, an updated SWPCP that included additional stormwater treatment measures with the goal of achieving the benchmarks in Schedule A.9 of its NPDES permit in future discharges, as well as an explanation of the rationale for the treatment measures selected and the projected reduction of pollutant concentrations that would result.  Defendant violated these requirements by failing to timely submit an updated SWPCP that complies with all applicable requirements.  These permit requirements and Defendant's violations thereof are described in section I.A. of the Notice Letter and are hereby incorporated by reference.

38.    Additionally, Schedule A.6.a and A.6.c of Defendant's NPDES permit require Defendant to prepare and implement a SWPCP consistent with the requirements of the permit. Schedule A.7 of Defendant's NPDES permit describes the required elements for the SWPCP, which include a description of control measures installed and implemented to meet the technology and water quality based requirements in Schedule A.1 – A.5 and Schedule E; a description of how the stormwater control measures address potential pollutant sources from industrial activities and significant materials at the facility (Schedule A.7.b.v); and preventative maintenance procedures for conducting inspections, maintenance, and repairs (Schedule A.7.c.ii.).  The benchmark exceedances listed in Table 1, above, and the fact that the pollutant loadings in Defendant's stormwater discharges are increasing over time, demonstrate that Defendant has violated and is violating these permit requirements by failing to prepare and/or implement a SWPCP that meets permit requirements.  These permit requirements and Defendant's violations thereof are described in section I.D. of the Notice Letter and are hereby incorporated by reference.  These violations have occurred each and every day since Defendant obtained coverage under the NPDES Permit on September 12, 2013 and are ongoing.

COMPLAINT

3.      **Defendant Violated Its NPDES Permit by Failing to Implement Required Corrective Actions.**

39.     Defendant violated its NPDES permit by failing to take corrective actions in a timely manner after failing to implement control measures in its SWPCP.  Schedule A.3.d.i of Defendant's NPDES permit states:  "If the permit registrant is failing to implement the control measures in the SWPCP, they must take corrective actions and implement the measures before the next storm event if practicable, unless otherwise approved by [the Oregon Department of Environmental Quality] or Agent."  Additionally, Schedule A.3.d.ii of Defendant's NPDES permit states:

> If modifications to the control measures are necessary to meet the technology limits in the permit, permit registrant must revise SWPCP within 30 days, unless otherwise approved by DEQ or Agent.  Permit registrant must implement the corrective actions before the next storm event if practicable or no later than 60 days from discovering the violation, unless a later date is approved by DEQ or Agent.

The benchmark exceedances listed in Table 1, above, and the fact that the pollutant loadings in Defendant's stormwater discharges are increasing over time, demonstrate that Defendant is failing to minimize pollutant loadings in its stormwater discharges and also demonstrates that Defendant violated Schedule A.3.d of the NPDES permit by failing to fully implement its SWPCP and by failing to take corrective actions even though modifications to the control measures are necessary to meet the effluent limits in the permit.  These permit requirements and Defendant's violations thereof are described in section I.B. of the Notice Letter and are hereby incorporated by reference.  These violations have occurred each and every day since Defendant obtained coverage under the NPDES Permit on September 12, 2013 and are ongoing.

40.     Defendant violated Schedule A.6.c of its NPDES permit by abandoning or failing to fully implement the treatment measures incorporated into its SWPCP as part of the Tier II

COMPLAINT

Corrective Action triggered by its fourth year benchmark compliance evaluation under the prior 1200-Z NPDES permit.  Specifically, Defendant did not implement the Tier II corrective actions it identified in the revised SWPCP it developed as part of the Tier II Corrective Action triggered by its fourth year benchmark compliance evaluation under the prior 1200-Z NPDES permit.  Nor has Defendant implemented any substitute Tier II corrective action meeting permit requirements. These permit requirements and Defendant's violations thereof are described in section I.D. of the Notice Letter and are hereby incorporated by reference.  These violations have occurred each and every day since Defendant abandoned its efforts to timely implement the treatment measures, which occurred no later than September 12, 2015.

41.     Defendant violated its NPDES permit by failing to comply with the Tier I corrective actions in the permit.  Schedule A.10 of Defendant's NPDES permit obligates Defendant to conduct a Tier 1 Corrective Action Response anytime its stormwater sampling results exceed an applicable statewide benchmark identified in Schedule A.9, an applicable sector-specific benchmark identified in Schedule E, or an applicable impairment pollutant reference concentration identified in Defendant's permit assignment letter.  A Tier 1 Corrective Action requires Defendant, within 30 days of receiving the monitoring results, to investigate the cause of the elevated pollutant levels, review its SWPCP and the selection, design, installation, and implementation of control measures to ensure compliance with the NPDES permit, make any necessary revisions to the SWPCP, and submit the revisions to the City of Eugene.  Defendant's NPDES permit further requires Defendant to prepare and retain a Tier I report that summarizes the results of the investigation, the corrective actions taken or to be taken, the corrective action schedule, the basis for any determination that corrective action is not necessary, and whether

SWPCP revisions are necessary.  Defendant must implement the Tier I Corrective Action before the next storm even if possible or as soon as practicable.

42.     Defendant violated the corrective action requirements of Schedule A.10 of its NPDES permit by failing to timely complete a Tier I Corrective Action Response that fulfills all of the requirements described above for each of the benchmark exceedances for total copper, total lead, total zinc, total oil and grease, and chemical oxygen demand, and for each of the reference concentration exceedances for arsenic identified in Table 1 above.  These requirements and Defendant's violations thereof are described in section I.E.1. of the Notice Letter and are hereby incorporated by reference.  These violations have occurred each and every day since November 12, 2013 and are ongoing.

43.     Defendant also violated its NPDES permit by failing to comply with the Tier II corrective actions in the permit.  Schedule A.11 of the NPDES permit requires Defendant to complete a Tier II Corrective Action because it exceeded the benchmark for total suspended solids based upon its fourth year benchmark compliance evaluation under its prior 1200-Z NPDES permit.  Specifically, within two years of obtaining permit coverage, no later than September 12, 2015, Defendant must implement an updated SWPCP that includes additional stormwater treatment measures with the goal of achieving benchmarks in future discharges and an explanation of the rationale for the treatment measures selected and the projected reduction of pollutant concentrations that would result.

44.     Defendant violated Schedule A.11 of the NPDES permit by failing to fully and properly implement Tier II corrective actions for TSS within the time period required by the NPDES permit.  Specifically, Defendant did not implement the Tier II corrective actions it identified in the revised SWPCP it developed as part of the Tier II Corrective Action triggered by

its fourth year benchmark compliance evaluation under the prior 1200-Z NPDES permit.  Nor

has Defendant implemented any substitute Tier II corrective action meeting permit requirements.

These permit requirements and Defendant's violations thereof are described in section I.E.2. of

the Notice Letter and are hereby incorporated by reference.  These violations have occurred each

and every day since September 12, 2015 and are ongoing.

45.    Additionally, Schedule A.12 of the NPDES permit requires Defendant to

complete a Tier II Corrective Action Response if the geometric mean of sample results collected

during the 2nd year of coverage under its current NPDES permit exceed any statewide benchmark

in Schedule A.9.  Defendants' NPDES permit coverage letter explains that monitoring data

collected from July 1, 2013, to June 30, 2014, are to be used for this 2nd year benchmark

evaluation.  The Tier II Corrective Action then requires Defendant to revise its SWPCP to

include additional treatment measures with the goal of achieving benchmarks in future

discharges and to describe the rationale for the selection of the measures, the projected reduction

of pollutant concentrations, and the schedule for implementing the additional measures.  Under

its NPDES permit, Defendant must submit its revised SWPCP to the City of Eugene by

December 31st of the 3rd year of coverage under the current NPDES permit—*i.e.*, by December

31, 2014—and must fully implement that revised SWPCP by June 30 of the 4th year of coverage

under its NPDES permit.

46.    As indicated on Table 1 above, Defendant triggered these Tier II Corrective

Action requirements for total copper, total lead, and total zinc.  Defendant is in violation of

Schedule A.12 of its NPDES permit because it has failed to timely complete the Tier II

Corrective Action requirements described above for total copper, total lead, and total zinc,

including by failing to submit a revised SWPCP to the City of Eugene, Oregon by December 31,

2014.  These permit requirements and Defendant's violations thereof are described in section

I.E.2. of the Notice Letter and are hereby incorporated by reference.  These violations have

occurred each and every day since December 31, 2014 and are ongoing.

      **4.**      **Defendant Violated Its NPDES Permit by Failing to Inspect Its Facility and Mitigate and Report Its NPDES Permit Violations.**

      47.      Defendant violated its NPDES permit by failing to comply with the inspection

requirements in its NPDES permit.  Schedule B.7 of Defendant's NPDES permit requires

Defendant to conduct monthly inspections of areas exposed to stormwater and stormwater

control measures.  Defendant must prepare and maintain an inspection report for each monthly

inspection that documents the inspection results and any corrective actions that will be taken in

response.  On information and belief, Defendant violated Schedule B.7 of the NPDES permit by

failing to conduct and document each of the requisite monthly inspections in accordance with the

permit requirements.  These requirements and Defendant's violations thereof are described in

section I.F. of the Notice Letter and are hereby incorporated by reference.  These violations have

occurred each and every day since September 12, 2013 and are ongoing.

      48.      Defendant violated its NPDES permit by failing to comply with the mitigation

requirements in its NPDES permit.  Schedule F.A.3 of Defendant's NPDES permit requires

Defendant to take all reasonable steps to minimize or prevent any discharge in violation of its

NPDES permit.  The permit violations alleged herein demonstrate that Defendant has violated

and is violating Schedule F.A.3 of its NPDES permit by failing to take all reasonable steps to

minimize or prevent discharges in violation of the permit.  These permit requirements and

Defendant's violations thereof are described in section I.G. of the Notice Letter and are hereby

incorporated by reference.  These violations have occurred each and every day since September

12, 2013 and are ongoing.

49.     Defendant violated its NPDES permit by failing to report all instances of permit noncompliance to the applicable authorities.  Schedule F.D.6 of Defendant's NPDES permit requires Defendant to report to ODEQ or the City of Eugene all instances of permit noncompliance not reported under Schedule F.D.4 of F.D.5 of the permit at the time Defendant submits its monitoring reports.  Each noncompliance report must contain specific information. Defendant violated this permit requirement by failing to submit to the applicable authorities in a timely manner sufficient noncompliance reports that explain all instances of noncompliance with Defendant's NPDES permit.  On information and belief, Defendant has violated and is in violation of these permit requirements because it has failed to submit to ODEQ or the City of Eugene sufficient reports of all instances of permit noncompliance described in this Complaint that were not reported under Schedule F.D.4 of F.D.5 of the permit at the time Defendant submits its monitoring reports.  These permit requirements and Defendant's violations thereof are described in section I.H. of the Notice Letter and are hereby incorporated by reference. These violations are ongoing.

50.     Discharges from Defendant's facility contribute to the polluted conditions of the waters of the State, including Amazon Creek, the Amazon Diversion Canal, the Long Tom River, and the Willamette River.  Discharges from Defendant's facility contribute to the ecological impacts that result from the polluted condition of these waters and to NEDC's and its members' injuries resulting therefrom.

51.     A significant penalty should be imposed against Defendant under the penalty factors set forth in 33 U.S.C. § 1319(d).

52.     Defendant's violations were avoidable had Defendant been diligent in overseeing facility operations and maintenance.

53.     Defendant has benefited economically as a consequence of its violations and its failure to implement improvements at the facility.

## VI.     CAUSE OF ACTION

54.     Plaintiff hereby incorporates the previous paragraphs by reference.

55.     The violations of Defendant's NPDES permit described herein and in the Notice Letter constitute violations of an "effluent standard or limitation" as defined by section 505 of the CWA, 33 U.S.C. § 1365.

56.     Upon information and belief, the NPDES permit violations committed by Defendant are continuing or are reasonably likely to re-occur.  Any and all additional violations of Defendant's NPDES permit and the CWA which occur after those described in NEDC's Notice Letter but before a final decision in this action are continuing violations subject to this Complaint.

57.     Without the imposition of appropriate civil penalties and the issuance of an injunction, Defendant is likely to continue to violate its NPDES permit and the CWA to the further injury of NEDC, its member(s) and others.

58.     A copy of this Complaint will be served upon the Attorney General of the United States and the Administrator of the EPA as required by 33 U.S.C. § 1365(c)(3).

## VII.     RELIEF REQUESTED

Wherefore, NEDC respectfully requests that this Court grant the following relief:

A.     Declare that Defendant has violated and continues to be in violation of its NPDES permit, as alleged herein;

B.     Enjoin Defendant from operating its facility in a manner that results in further violations of its NPDES permit or the CWA;

COMPLAINT

C.      Order Defendant to immediately implement a SWPCP that complies with its NPDES permit;

D.      Order Defendant to allow NEDC to participate in the development and implementation of Defendant's SWPCP;

E.      Order Defendant to provide NEDC, for a period of time beginning on the date of this Court's Order granting NEDC relief and running for one year after Defendant achieves compliance with all of the conditions of its NPDES permit, with copies of all reports and other documents that Defendant submits to the EPA or to ODEQ regarding Defendant's NPDES permit at the time those documents are submitted to these agencies;

F.      Order Defendant to take specific actions to remediate the environmental harm caused by its violations;

G.      Grant such other preliminary and/or permanent relief as NEDC may from time to time request during the pendency of this case;

H.      Order Defendant to pay civil penalties of $37,500.00 per day of violation for each violation committed by Defendant pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and 40 C.F.R. § 19;

I.      Award NEDC its litigation expenses, including reasonable attorneys' and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

J.      Award such other relief as this Court deems appropriate.

RESPECTFULLY SUBMITTED this 17th day of December, 2015.

KAMPMEIER & KNUTSEN PLLC

By:  s/ Brian A. Knutsen
  Brian A. Knutsen, OSB # 112266
  833 S.E. Main St., No. 318
  Portland, Oregon 97214
  Tel: (503) 841-6515
  Email: brian@kampmeierknutsen.com

By:  s/ Paul A. Kampmeier
  Paul A. Kampmeier, WSBA No. 31560
  **Applicant for admission *pro hac vice***
  615 Second Avenue, Suite 360
  Seattle, Washington 98104-2245
  Tel: (206) 223-4088 x 4
  Email: paul@kampmeierknutsen.com

*Attorneys for Plaintiff NEDC*

COMPLAINT

# EXHIBIT 1

# KAMPMEIER & KNUTSEN PLLC

## ATTORNEYS AT LAW

PAUL A. KAMPMEIER
Licensed in Washington
206.223.4088 x 4
paul@kampmeierknutsen.com

September 24, 2015

*Via Certified Mail - Return Receipt Requested*

Managing Agent
BJB Milling & Lumber, LLC
101 Iowa Street
Eugene, Oregon 97402

**Re:     Notice of Intent to File Suit under the Clean Water Act.**

Dear Managing Agent:

This letter provides BJB Milling & Lumber, LLC (hereinafter "BJB Milling") with sixty days' notice of the Northwest Environmental Defense Center's intent to file a citizen lawsuit against it under Section 505 of the Clean Water Act, 33 U.S.C. §1365, for the Clean Water Act violations described in this letter. The Northwest Environmental Defense Center (hereinafter "NEDC") is a non-profit organization dedicated to protecting the natural environment of the Pacific Northwest. Kampmeier & Knutsen, PLLC represents NEDC in this matter and any response to this notice of intent to sue should be directed to us at the address below.

## I.     VIOLATIONS OF THE CLEAN WATER ACT.

Congress enacted the Clean Water Act in 1948 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §1251(a). In doing so, Congress declared a national goal of eliminating discharges of pollutants to navigable waters by 1985. To limit and control water pollution in Eugene, Oregon, the Oregon Department of Environmental Quality and the City of Eugene, Oregon authorized BJB Milling to discharge stormwater associated with industrial activity from July 1, 2012 to June 30, 2017 by granting BJB Milling coverage under Oregon's General National Pollutant Discharge Elimination System Stormwater Discharge Permit No. 1200-Z (File Number 108749) (hereinafter "NPDES permit").

BJB Milling's NPDES permit authorizes BJB Milling to discharge stormwater associated with industrial activity, provided the discharges are "in conformance with all the requirements, limitations, and conditions set forth" in the permit. Any other direct or indirect discharge to waters of the state is

prohibited, including those discharges that are not in compliance with the terms and conditions of the permit. See Schedule A.13.a and Schedule F of the 2012 1200-Z permit, Section A (Duty to Comply) ("Any permit noncompliance constitutes a violation of ... the Clean Water Act ... and is grounds for enforcement action....").

BJB Milling has violated and is violating Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342), by discharging pollutants and stormwater associated with industrial activity from the BJB Milling facility at or near 101 Iowa Street, Eugene, Oregon 97402 (hereinafter the "facility"), to Amazon Creek (also known as the Amazon Diversion Canal), the Long Tom River, and the Willamette River, in violation of the terms and conditions of BJB Milling's NPDES permit. This letter provides sixty days' notice of NEDC's intent to sue over violations at the facility, as well as violations at any properties that are owned or operated by BJB Milling and contiguous or adjacent to the facility.

## A.    VIOLATIONS OF THE PERMIT APPLICATION REQUIREMENTS.

Because BJB Milling exceeded the benchmark for total suspended solids ("TSS") for its fourth year geometric mean evaluation under BJB Milling's prior 1200-Z NPDES permit, Condition 4.a.ii.1 of the "Permit Coverage and Exclusion from Coverage" section of BJB Milling's NPDES permit required BJB Milling to submit to the City of Eugene, by March 31, 2012, an updated Stormwater Pollution Control Plan (hereinafter "SWPCP") that included additional stormwater treatment measures, with the goal of achieving the benchmarks in Schedule A.9 of its NPDES permit in future discharges, as well as an explanation of the rationale for the treatment measures selected and the projected reduction of pollutant concentrations that would result. A licensed professional engineer or certified engineering geologist must design and stamp the portion of the SWPCP that addresses the additional treatment measures. BJB Milling has violated and is violating this permit requirement by failing to timely submit an updated SWPCP that complies with all of these requirements. This violation has occurred each and every day since March 31, 2012.

## B.    VIOLATIONS OF THE NARRATIVE, TECHNOLOGY-BASED EFFLUENT LIMITS AND THE CONTROL MEASURES REQUIRED TO MEET THOSE LIMITS.

Schedule A.1 of BJB Milling's NPDES permit requires BJB Milling to meet the listed narrative technology-based effluent limits and any additional sector-specific limits in Schedule E of the NPDES permit. The narrative technology-based effluent limits in Schedule A.1 of the permit require BJB Milling, among other things, to "minimize exposure of manufacturing, processing, [and] material storage areas ... to rain, snow, snowmelt and runoff" (Schedule A.1.a); to employ measures to eliminate or minimize oil and grease contamination of stormwater discharges (Schedule A.1.b); to "recycle or properly dispose of wastes to eliminate or minimize exposure of pollutants to stormwater" (Schedule A.1.c); to "stabilize exposed areas and contain runoff using structural and nonstructural controls to minimize erosion of soil at the site and sedimentation" (Schedule A.1.d); to "employ screens, booms, settling ponds, or other methods to eliminate or minimize waste, garbage and floatable debris in stormwater discharges and ensure that this debris is not discharged to receiving waters" (Schedule A.1.e); "to minimize generation of dust and off-site tracking of raw, final or waste materials" (Schedule A.1.f); to "routinely clean all exposed areas that may contribute pollutants to stormwater using such measures as sweeping at regular intervals, litter pick-up, keeping materials orderly and labeled, prompt

clean-up of spills and leaks, proper maintenance of vehicles and stowing materials in appropriate containers" (Schedule A.1.g); to minimize the potential for spills and develop spill prevention and response plans (Schedule A.1.h); to regularly inspect, clean, maintain and repair all equipment, systems, areas, and stormwater control measures (Schedule A.1.i); and to develop and maintain an employee education program on the components and goals of the SWPCP (Schedule A.1.j).

Schedule E.A.1 of the NPDES permit identifies the sector specific narrative technology-based effluent limits applicable to the facility, which require BJB Milling to limit the discharge of wood debris, minimize leachate from decaying wood materials, and minimize the generation of dust.

Additionally, Schedule A.3.a of BJB Milling's NPDES permit requires BJB Milling "to select, design, install, implement and maintain control measures to meet the narrative and numeric technology based effluent limits in Schedule A.1, A.2 and Schedule E of the permit and [to] describe[] these measures in the SWPCP." Schedule A.6.c of the NPDES permit then requires BJB Milling to implement the SWPCP. Perhaps most importantly, Schedule A.3.b of the NPDES permit requires BJB Milling to "**...reduce or eliminate pollutants to the extent achievable** using control measures that are technologically available and economically practicable and achievable in light of best industry practice."

BJB Milling has violated and is violating these NPDES permit conditions by failing meet the narrative technology based effluent limits in Schedule A.1 and Schedule E of the NPDES permit; by failing to select, design, install, implement, and maintain control measures that meet the narrative technology-based effluent limits in Schedule A.1 and Schedule E; by failing to describe such measures in its SWPCP; and by failing to fully implement its SWPCP. These violations are demonstrated by the fact that BJB Milling is greatly exceeding the pollutant benchmarks imposed by Schedule A.9 of the permit. These violations have occurred each and every day since BJB Milling obtained coverage under the NPDES Permit on September 12, 2013.

Schedule A.9 of the NPDES permit explains that the benchmarks "are designed to assist the permit registrant in determining whether its site controls are effectively reducing pollutant concentrations in stormwater discharged from the site." Schedule A. establishes the following statewide benchmark applicable to BJB Milling: total copper 0.020 mg/L; total lead 0.040 mg/L; total zinc 0.12 mg/L; pH 5.5 – 9.0 S.U.; total suspended solids 100 mg/L; and total oil and grease 10 mg/L. Schedule E.A.3 establishes the following sector-specific benchmark applicable to BJB Milling: chemical oxygen demand 120.0 mg/L. BJB Milling discharges to a water body that is not meeting water quality standards for various pollutants, including arsenic, and the NPDES permit therefore requires BJB Milling to monitor for this parameter and establishes a reference concentration for arsenic of 0.0021 mg/L. BJB Milling has repeatedly failed to meet these benchmarks, as indicated in Table 1 below.

**Table 1**
**Discharge Monitoring Results Reported by BJB Milling**

| | pH (S.U.) (Bench-mark: 5.5 - 9.0 S.U.) | TSS (mg/L) (Bench-mark: 100 mg/L) | O & G (mg/L) (Bench-mark 10 mg/L) | Copper (mg/L) (Bench-mark: 0.020 mg/L) | Lead (mg/L) (Bench-mark: 0.040 mg/L) | Zinc (mg/L) (Bench-mark: 0.12 mg/L) | COD (mg/L) (Bench-mark 120 mg/L) | Arsenic (mg/L) (Bench-mark: 0.0021 mg/L) |
|---|---|---|---|---|---|---|---|---|
| 11/12/13 | 6.9 | **1420** | ND | **0.37** | **0.12** | **0.74** | 399 | **0.017** |
| 12/13/13 | 8 | **1110** | ND | **0.23** | **0.058** | **1.1** | 370 | |
| 2/18/14 | 6.8 | **1220** | **29.5** | **0.18** | **0.049** | **0.84** | 333 | **0.007** |
| 3/27/14 | 6.55 | **7660** | **49.3** | **0.31** | **0.36** | **4.5** | **1580** | |
| Geo-Mean | | **2001.8** | 9.76 | **0.2625** | **0.105** | **1.3244** | 527.92 | |
| 11/3/14 | 7.14 | **1860** | **30.1** | **0.444** | **0.152** | **2.38** | 612 | **0.0189** |
| 11/21/14 | 7.29 | **3900** | **56.2** | **0.661** | **0.223** | **3.59** | 961 | |
| 2/2/15 | 7.1 | **2400** | **55** | **0.458** | **0.284** | **2.83** | 1100 | **0.0079** |
| 3/23/15 | W | **2000** | **32** | **0.46** | **0.19** | **2.4** | 150 | |
| Geo-Mean | | **2429** | **42** | **0.499** | **0.207** | **2.76** | 558 | |

TSS – total suspended solids
O & G – oil and grease
COD – chemical oxygen demand
ND – No Detect, result below analysis detection level
W – Waiver, monitoring requires for the parameters are waived
**Bold** – result is over the permit benchmark

The benchmark exceedances by BJB Milling are ongoing and demonstrate that BJB Milling's site controls are not effectively minimizing or reducing pollutants in stormwater discharged from the facility. BJB Milling can and must do more to reduce those pollutant loads, including revising its SWPCP and then implementing those revisions in a timely manner.

The significant increases in pollutant loadings in BJB Milling's stormwater discharges from one year to the next, and from one month to the next, also demonstrate that BJB Milling could be, but is not, doing more to minimize and eliminate pollutants in its stormwater discharges, in violation of Schedule A.1, A.3.a, and A.3.b of the NPDES permit. The Industrial Stormwater Discharge Monitoring Reports that BJB Milling submitted to the City of Eugene since 2012 demonstrate a very significant increase in pollutant loading from one year to the next. For example, the geometric mean value for total suspended solids for the year July 1, 2012 to June 30, 2013 was 182.2 mg/L, while the geometric mean value for total suspended solids for the next year, July 1, 2013 to June 30, 2014, was more than ten times that, at 2001.81 mg/L. Those same Industrial Stormwater Discharge Monitoring Reports demonstrate a similar, very significant increase in pollutant loading for copper, where the geometric mean value more than doubled from one year to the next, and for zinc, where the geometric mean value more than quadrupled from one year to the next. Similarly, the sample results for February and March 2014 show that discharges of Chemical Oxygen Demand more than quadrupled in that short time period. And the

- 4 -

geometric mean values for TSS, Copper, Lead, Zinc, Oil and Gas, Chemical Oxygen Demand, and Arsenic then increased yet again over the course of 2014-2015. These significant increases in pollutant loadings demonstrate that BJB Milling could be, but is not, doing more to minimize and eliminate pollutants in its stormwater discharges, in violation of Schedule A.1, A.3.a, and A.3.b. of the NPDES permit.

BJB Millings' failure to minimize pollutant loadings in its stormwater discharges also demonstrates that BJB Milling has violated and is violating Schedule A.3.d of the NPDES permit. Schedule A.3.d.i of BJB Milling's NPDES permit states: "If the permit registrant is failing to implement the control measures in the SWPCP, they must take corrective actions and implement the measures before the next storm event if practicable, unless otherwise approved by [the Oregon Department of Environmental Quality] or Agent." Additionally, Schedule A.3.d.ii of BJB Milling's NPDES permit states:

> If modifications to the control measures are necessary to meet the technology limits in the permit, permit registrant must revise SWPCP within 30 days, unless otherwise approved by DEQ or Agent. Permit registrant must implement the corrective actions before the next storm event if practicable or no later than 60 days from discovering the violation, unless a later date is approved by DEQ or Agent.

BJB Milling has violated and is violating these requirements by failing to fully implement its SWPCP and by failing to take corrective actions even though modifications to the control measures are necessary to meet the effluent limits in the permit. These violations have occurred each and every day since BJB Milling obtained coverage under the NPDES Permit on September 12, 2013

### C.    VIOLATIONS OF WATER QUALITY BASED EFFLUENT LIMITATIONS.

Schedule A.4.a of BJB Milling's NPDES permit prohibits BJB Milling from causing or contributing to a violation of instream water quality standards as established in Oregon Administrative Rules 340-041. BJB Milling discharges to a water body identified as failing to meet the water quality standard for arsenic. As indicated in Table 1 above, discharges from BJB Milling contain elevated levels of arsenic. BJB Milling has violated and is violating Schedule A.4.a of the NPDES permit by discharging stormwater that causes or contributes to violations of the water quality standard for arsenic in the receiving water. These violations have occurred each and every day since BJB Milling obtained coverage under the NPDES Permit on September 12, 2013, on which there was 0.1 inch or more of precipitation, including on the following days when BJB Milling collected a sample of its discharge that exceeded the reference concentration for arsenic: November 12, 2013; February 18, 2014; November 3, 2014; and February 2, 2015.

### D.    SWPCP VIOLATIONS.

Schedule A.6.a and A.6.c require BJB Milling to prepare and implement a SWPCP consistent with the requirements of the NPDES permit. Schedule A.7 of the NPDES permit describes the required elements for the SWPCP, which include a description of control measures installed and implemented to meet the technology and water quality based requirements in Schedule A.1 – A.5 and Schedule E; a description of how the stormwater control measures address potential pollutant sources from industrial

- 5 -

activities and significant materials at the facility (Schedule A.7.b.v); and preventative maintenance procedures for conducting inspections, maintenance, and repairs (Schedule A.7.c.ii.).  BJB Milling has violated and is violating these requirements by failing to prepare and/or implement a SWPCP that meets these requirements.  These violations have occurred each and every day since BJB Milling obtained coverage under the NPDES Permit on September 12, 2013.  BJB Milling has further violated and is violating Schedule A.6.c of its NPDES permit because it has abandoned and/or failed to fully and properly implement the treatment measures incorporated into its SWPCP as part of the Tier II Corrective Action triggered by its fourth year benchmark compliance evaluation under the prior 1200-Z NPDES permit.  These violations have occurred each and every day since BJB Milling abandoned its efforts to timely implement the treatment measures, which occurred no later than September 12, 2015.

E.      CORRECTIVE ACTION VIOLATIONS.

1.      *Tier I Violations.*

Schedule A.10 of BJB Milling's NPDES permit obligates BJB Milling to conduct a Tier 1 Corrective Action Response anytime its stormwater sampling results exceed an applicable statewide benchmark identified in Schedule A.9, an applicable sector specific benchmark identified in Schedule E, or an applicable impairment pollutant reference concentration identified in BJB Milling's permit assignment letter.  A Tier 1 Corrective Action requires BJB Milling, within 30 days of receiving the monitoring results, to investigate the cause of the elevated pollutant levels, review its SWPCP and the selection, design, installation, and implementation of control measures to ensure compliance with the NPDES permit, make any necessary revisions to the SWPCP, and submit the revisions to the City of Eugene.  The NPDES permit further requires that BJB Milling prepare and retain a Tier I report that summarizes the results of the investigation, the corrective actions taken or to be taken, the corrective action schedule, the basis for any determination that corrective action is not necessary, and whether SWPCP revisions are necessary.  The Tier I Corrective Action must be implemented before the next storm even if possible or as soon as practicable.

BJB Milling has repeatedly exceeded benchmarks and the arsenic reference concentration as indicated in Table 1 above.  BJB Mill has violated and is violating the requirements of Schedule A.10 of the NPDES permit by failing to timely complete a Tier I Corrective Action Response that fulfills all of the requirements described above for each of the benchmark exceedances for total copper, total lead, total zinc, total oil and grease, and chemical oxygen demand, and for each of the reference concentration exceedances for arsenic identified in Table 1 above.  (BJB Milling has also exceeded the benchmark for total suspended solids, but is exempt from Tier I requirements because it is required to implement a Tier II for total suspended solids under Schedule S.11).

2.      *Tier II Violations.*

Schedule A.11 of the NPDES permit requires facilities to complete a Tier II Corrective Action if it exceeded a benchmark based upon the 4th year benchmark compliance evaluation required under the previous iteration of the NPDES permit.  This Tier II Corrective Action requires permittees, within two years of obtaining permit coverage, to install and implement the treatment measures prescribed by Condition 4 of the Permit Coverage and Exclusion Section of the NPDES permit.  That provision requires permittees to prepare an updated SWPCP that includes additional stormwater treatment

- 6 -

measures with the goal of achieving benchmarks in future discharges and an explanation of the rationale for the treatment measures selected and the projected reduction of pollutant concentrations that would result.  BJB Milling exceeded the benchmark for total suspended solids (TSS) based upon its fourth year benchmark compliance evaluation under the prior 1200-Z NPDES permit and was therefore required to have fully installed and implemented the treatment measures within two years of obtaining permit coverage—no later than September 12, 2015.  BJB Milling has violated and is violating Schedule A.11 of the NPDES permit by failing to fully and properly implement Tier II corrective actions for TSS within the time period required by the NPDES permit.  These violations have occurred each and every day since September 12, 2015.

Additionally, Schedule A.12 of the NPDES permit requires BJB Milling to complete a Tier II Corrective Action Response if the geometric mean of sample results collected during the 2nd year of coverage under the current NPDES permit exceed any statewide benchmark of Schedule A.9.  This Tier II Corrective Action requires permittees to revise the SWPCP to include additional treatment measures with the goal of achieving benchmarks in future discharges and to describe the rationale for the selection of the measures, the projected reduction of pollutant concentrations, and the schedule for implementing the additional measures.  A licensed professional engineer or a certified engineering geologist must design and stamp the portion of the SWPCP that addresses the treatment measures.  The revised SWPCP must be submitted to the City of Eugene by December 31st of the 3rd year of coverage under the current NPDES permit—i.e., by December 31, 2014—and fully implemented by June 40 of the 4th year of coverage under the current NPDES permit.  As described in BJB Milling's NPDES permit coverage letter, monitoring data collected during the July 1, 2013 to June 30, 2014 monitoring year are to be used as the 2nd year data for triggering the Tier II Corrective Action requirements of Schedule A.12.

As indicated on Table 1 above, BJB Milling triggered these Tier II Corrective Action requirements for total copper, total lead, and total zinc.  BJB Milling is in violation of the requirements of Schedule A.12 of the NPDES permit because it has failed to timely complete the Tier II Corrective Action requirements described above for these parameters, including by failing to submit a revised SWPCP to the City of Eugene, Oregon by December 31, 2014.  These violations have occurred each and every day since December 31, 2014.

F.    VIOLATIONS OF INSPECTION REQUIREMENTS.

Schedule B.7 of the NPDES permit requires BJB Milling to conduct monthly inspections of areas exposed to stormwater and where stormwater control measures, structures, catch basins, and treatment facilities are located.  BJB Milling must inspect for: industrial material that could contact stormwater, leaks or spills, offsite tracking of materials, tracking or blowing of materials, evidence of, or the potential for, pollutants entering the drainage system, evidence of pollutants discharging to waters at all outfalls, the presence of floating solids, foam, oil sheen, discoloration of discharges at all outfalls, and properly functioning stormwater control measures.  An inspection report must be prepared and maintained for each monthly inspection that documents the inspection date and time, control measures needing cleaning, replacement, maintenance, reconditioning or repair, the condition of the drainage/conveyance system and need for maintenance, previously unidentified sources of pollutants, stormwater discharge observations and whether discharges contained floating solids, foam, oil sheen, or discoloration, and any corrective actions that will be taken in response to the inspection.  Based upon information and belief, BJB Milling is in violation of Schedule B.7 of the NPDES permit because, since

obtaining permit coverage on September 12, 2013, it has failed to conduct and document each of the requisite monthly inspections in accordance with the requirements described above.

G.    VIOLATIONS FOR FAILURE TO MITIGATE.

Schedule F.A.3 of BJB Milling's NPDES permit requires BJB Milling to take all reasonable steps to minimize or prevent any discharge in violation of BJB Milling's NPDES permit.  Each of the permit violations alleged in this notice of intent to sue also constitutes a violation of Schedule F.A.3 of BJB Milling's NPDES permit.  As explained throughout this notice of intent to sue, BJB Milling has failed and is failing "to take all reasonable steps to minimize or prevent any discharge in violation of BJB Milling's NPDES permit."

H.    NONCOMPLIANCE REPORTING VIOLATIONS.

Schedule F.D.6 of BJB Milling's NPDES permit requires BJB Milling to report to DEQ or the City of Eugene all instances of noncompliance not reported under General Condition D.4 or D.5 (Schedule F.D.4 of F.D.5) at the time BJB Milling submits its monitoring reports.  Each noncompliance report must contain a description of the noncompliance and its cause, the period of noncompliance, an estimate of the time noncompliance is expected to continue, and the steps taken or planned to reduce, eliminate and prevent recurrence of the noncompliance.  BJB Milling has violating and is violating this permit requirement because it failed to submit to the Oregon Department of Environmental Quality or the City of Eugene sufficient noncompliance reports explaining all the instances of noncompliance described in this notice letter in a timely manner.

**II.    PARTY GIVING NOTICE.**

The full name, address, and telephone number of the party giving notice is:

Northwest Environmental Defense Center
10015 S.W. Terwilliger Boulevard
Portland, Oregon 97219
(503) 768-6673

**III.    ATTORNEYS REPRESENTING NEDC.**

The attorneys representing NEDC in this matter are:

Paul Kampmeier and Brian Knutsen
Kampmeier & Knutsen, PLLC
615 Second Avenue, Suite 360
Seattle, Washington 98104
(206) 223-4088 extension 4

## IV.    CONCLUSION.

The permit violations described and alleged in this notice of intent to sue are ongoing and violate the Clean Water Act.  At the conclusion of the 60-day notice period, NEDC intends to file a lawsuit against BJB Milling under the citizen suit provisions of Section 505 of the Clean Water Act, 33 U.S.C. § 1365.  Each of the above-described violations subjects the violator to a penalty of up to $37,500 per day. In addition to civil penalties, NEDC will seek injunctive relief to prevent further violations and such other relief as is permitted by law, including recovery of NEDC's costs, attorneys' fees, and expert witness fees.  See 33 U.S.C. §§ 1365(a) and (d).  Although the above-described violations reflect the information currently available to NEDC, NEDC intends to sue for all violations, including those yet to be uncovered and those committed after the date of this notice letter.

During the 60-day notice period NEDC will be willing to discuss effective remedies for the violations described in this letter.  If you wish to pursue settlement discussions in the absence of litigation, we suggest that you initiate discussions within 10 days of receiving this notice so the parties can meet and discuss effective remedies for the violations alleged herein.  NEDC does not intend to delay the filing of a complaint if discussions are ongoing when the notice period ends.

Very truly yours,

Kampmeier & Knutsen, PLLC

By: _____

Paul A. Kampmeier
Brian A. Knutsen

cc:    Gina McCarthy, Administrator, U.S. Environmental Protection Agency
       Dennis McLerran, Region 10 Administrator, U.S. Environmental Protection Agency
       Dick Pedersen, Director, Oregon Department of Environmental Quality
       Mr. James Youel, Registered Agent for BJB Milling & Lumber, LLC, 188 West B Street,
       Building O, Springfield, Oregon 97477

## CERTIFICATE OF SERVICE

I, Paul Kampmeier, declare under penalty of perjury of the laws of the United States that I am

counsel for Northwest Environmental Defense Center and that on September 24, 2015, I caused copies

of the foregoing Notice of Intent to Sue Under the Clean Water Act to be served on the following by

depositing it with the U.S. Postal Service, postage prepaid, via certified mail, return receipt requested:

Managing Agent
BJB Milling & Lumber, LLC
101 Iowa Street
Eugene, Oregon 97402

Administrator Regina A. McCarthy
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W., Mail Code 1101A
Washington, D.C. 20460

Regional Administrator Dennis J. McLerran
U.S. Environmental Protection Agency, Region 10
1200 Sixth Avenue, Mail Code RA-210
Seattle, Washington 98101

Director Dick Pedersen
Oregon Department of Environmental Quality
811 S.W. Sixth Avenue
Portland, Oregon 97204-1390

Mr. James Youel
188 West B Street, Building O
Springfield, Oregon 97477

_____
Paul Kampmeier